THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK

*v.*

THE ERIE RAILROAD COMPANY et al.

[Decided December 4th, 1908.]

1. A case involving the rights of the parties in case of conflicting easements is one of equitable, and not of legal, cognizance, and appertains to the exclusive, and not auxiliary or concurrent, jurisdiction of chancery.

2. The case of the rights of two tenants in common of an easement is one of equitable cognizance, and equity may use any remedy appropriate to the circumstances, either preventive or mandatory, adequate to promote and secure the joint user in such a way as the law requires in view of the particular situation.

3. The test of equity jurisdiction in a case affecting the rights of tenants in common of an easement is the existence of actual conflict; and, if there is no conflict, there is no jurisdiction.

4. The court of chancery does not ordinarily compel a corporation to do its duty, the performance of which, neglected or contested, is enforced by the supreme court by *mandamus*.

5. The court of chancery has power to compel railroad elevation over highways, if that is the only way in which joint user can be properly secured and enjoyed.

6. In view of the legislation of this state recognizing that railroads may cross streets at grade, it cannot be held that grade crossings are *per se* illegal structures even in cities, or that streets are not safe, in the legislative sense of that word, merely because they are crossed at grade by a railroad crossing, but the situation must be such that nothing but track elevation will protect the public.

7. It cannot be maintained that streets become unsafe and inconvenient when more than one track is laid across them.

8. If a street is so encumbered with railroad tracks that the public is practically shut out from using it, the appropriate remedy in such a case is an injunction restraining their excessive use; neither party being at liberty to destroy the right of the other.

9. If the number of tracks crossing a street be not excessive, the question whether trains run over them with such frequency and such speed and at such an angle or with such curves, that the joint user of the crossing would be practically gone, and so necessitate elevation of the tracks, is one of fact, to be determined according to the circumstances of the case.

10. Tracks cannot be built over a street, or used thereon for the convenience of factory or yard or station purposes, and thus injuriously affect the public traffic over the highway.

11. The right of a railroad over a highway is a right of passage, with its reasonable incidents, and nothing more.

12. Evidence *held* not to show that a railroad elevation over a street was the only way in which joint user could be properly secured and enjoyed.

13. A bill praying, not only for the depression or elevation of railway tracks at a street crossing, but also for general relief, is broad enough to warrant an injunction against the use in the highway of certain tracks illegally obstructing the way, and the unlawful use of another track for an unauthorized purpose.

*Mr. Joseph Coult,* for the complainant.

*Mr. Cortlandt Parker* and *Mr. Charles Corbin,* for the defendants.

STEVENS, V. C.

This is a bill to compel the defendant companies to elevate their tracks where they cross Summer avenue, in the city of Newark. The bill was demurred to and the demurrer overruled. *Newark* v. *Erie Railroad Co., 72 N. J. Eq. (2 Buch.) 447.* In overruling it Chancellor Magie reaffirmed the rule laid down by Chief-Justice Beasley in *Central Railroad Co.* v. *State, 32 N. J. Law (3 Vr.) 220,* to the effect that the duty imposed upon railroads whose charter provisions are similar to those of the Central railroad is to "keep at all times and under all circumstances the public highways, at the point where they cross the railroad, in a condition fit for safe and convenient use." Both the supreme court and this court have approved the rule in the numerous cases cited by the chancellor. If there was any doubt about its correctness, that doubt has been set at rest by the recent decision of the court of errors and appeals in *Borough of Metuchen* v. *Pennsylvania Railroad Co., 73 N. J. Eq. (3 Buch.) 359.*

The act of 1898 does not confer upon this court the power to abolish grade crossings. It merely authorizes it to make reasonable provision for their protection. The act is, in terms, limited to cases where the public road or highway "is crossed by a railroad track *at the same grade or level."* The effect of the act was considered in *Palmyra* v. *Pennsylvania Railroad Co., 62 N. J. Eq. (17 Dick.) 611; 63 N. J. Eq. (18 Dick.) 799,* and in

*Eckert* v. *Perth Amboy and Woodbridge Railroad Co., 66 N. J. Eq. (21 Dick.) 487.* · Section 29 of the General Railroad act (*P. L. 1903 p. 660*), is, however, held by Chancellor Magie, in his opinion overruling the demurrer (*72 N. J. Eq. (2 Buch.) 447*), to authorize the court to decree track elevation. The section reads as follows:

"When any company shall not properly construct and maintain the bridges or other crossings of highways by its railroad tracks as required by law, it shall be lawful for the governing body of the township or municipality wherein such crossings are located, within a reasonable time, after notice to the company, to construct or repair such bridges or other crossings and the cost thereof may be collected from the company whose duty it is to make such construction or repair by action in any court of competent jurisdiction; or, in lieu of such construction or repair, the township or municipality may proceed by a suit in equity to compel the specific performance of the duties imposed by law upon such company with respect to the construction, maintenance and repair of such bridges and crossings and the court shall prescribe the crossing to be constructed or the repairs to be made, and in order to enforce obedience to its decree or mandate, the court may restrain the exercise of any of the franchises of the company or adopt such other remedies as may be in accordance with the practice of the court."

· Referring to this section the chancellor says: "The claim that no statutory jurisdiction has been conferred on this court to prescribe the crossing to be constructed, if any railroad company shall not properly construct bridges or other crossings of highways as required by law, may be for the present passed by with the observation that by section 29 of the revised Railroad act of 1903, the legislature has undertaken to confer, and has conferred, by language which is incapable of any other construction, precisely the jurisdiction in question. It is contended, however, that in so doing, the legislature exceeded its constitutional powers. This contention will hereafter be considered. That the twenty-ninth section of the act above cited does, by its terms, confer such jurisdiction has been settled in this court. *Pennsylvania Railroad Co.* v. *Metuchen, 71 N. J. Eq. (1 Buch.) 404.*

The case referred to was one in which a bill had been filed by the borough of Metuchen against the company to compel it to widen a bridge over a highway, its tracks being laid upon this bridge. It appeared that the railroad had originally crossed the

highway at grade, but that the company had elevated its tracks, and in so doing, had narrowed the highway by placing abutments therein and otherwise contracting it. It was held by Vice-Chancellor Pitney, in this court, that section 29 gave this court jurisdiction to make an order directing the company so to reconstruct and lengthen its bridge that the public might have the use of the highway to its full width. The court of errors and appeals (*73 N. J. Eq. (3 Buch.) 359*) sustained the vice-chancellor in his view of the jurisdiction conferred, but differed with him on the question of fact.

Section 29 contains two clauses. The first authorized the governing body of the township or municipality to construct and repair "bridges and other crossings," if the company shall not properly construct and maintain them. I think it may be doubted whether this clause would be held to confer upon municipalities the right, after notice, to interfere with the company's rails, and with the structure supporting those rails, or to give it the right to change the grade of the railroad. The words, taken according to their natural import, would seem to authorize municipalities to build bridges over cuts, to plank between the rails and to do such other acts as would interfere little, if at all, with the exclusive control exercised by the company over its roadbed. The second clause of section 29—the part that was construed by this court and the court of errors and appeals—gives the township *in lieu of* such construction and repair the right to proceed by a suit in equity to compel the specific performance of the duties imposed by law upon the railroad company "with respect to the construction, maintenance and repair of such bridges and crossings"—*i. e.,* such bridges and crossings as the company did not properly "construct and maintain."

As the same words, "construct" and "maintain" and "repair," are found in both clauses, it might be argued with some plausibility that the second clause was intended to apply to the same classes of cases that the first clause was. But this view appears to have been rejected not only here but in the court of errors and appeals, unless we take the view that power is given to the municipality to interfere with the grade and structure of the roadbed. Chief-Justice Gummere says: "The grounds which

led the learned vice-chancellor to the conclusion that the matters involved in the litigation were cognizable in the court of chancery are fully set out in his opinion, and we concur in the views expressed by him upon this point and in his conclusion." The vice-chancellor, in his opinion, had said: "The power of the court to compel, by mandatory proceedings, the railroad corporation to do its duty in this respect (*i. e.,* to widen its bridges and remove a part of its embankment) rests, so far as I am aware, *wholly* upon the statute of 1903."

Had it not been for this expression of opinion I should have thought that the power might have been referred to the jurisdiction exercisable in the case of conflicting easements. *Delaware, Lackawanna and Western Railroad Co.* v. *Erie Railroad Co., 21 N. J. Eq.* (*6 C. E. Gr.*) *302; National Docks Railroad Co.* v. *Central Railroad Co., 32 N. J. Eq.* (*5 Stew.*) *755, 767; National Docks Railroad Co.* v. *United Companies, 53 N. J. Law* (*24 Vr.*) *218, 224.* A case of that sort is one of equitable and not of legal cognizance. It appertains to the exclusive and not to the auxiliary or concurrent jurisdiction of chancery. Says Chief-Justice Beasley in the leading case (*Delaware, Lackawanna and Western Railroad Co.* v. *Erie Railroad Co., supra*) : "They (the two companies) are tenants in common of an easement, and if this court cannot protect the one against the injustice of the other the party whose rights are invaded is clearly without any adequate remedy." But if the case is one of equitable cognizance it would seem to follow that equity may use *any* remedy appropriate to the circumstances. Not only a remedy merely preventive, but also one that is mandatory—any remedy whatsoever, out of its store of remedies, adequate to promote and secure the joint user in such a way as the law requires, in view of the particular situation.

The test of jurisdiction would seem to be the existence of actual conflict. If there is no conflict there is no jurisdiction. This court does not ordinarily compel a corporation to do its duty. Performance of a duty neglected or contested is enforced by the supreme court by *mandamus*. It would seem to have been this aspect of the matter that presented itself to the judges in *New York and Greenwood Lake Railroad Co.* v. *Montclair, 47 N.*

*J. Eq. (2 Dick.) 591.* The case was one of demurrer to a bill, and, as will be seen by a reference to the facts stated in the preface to the opinion of the chancellor (*45 N. J. Eq. (18 Stew.)* *436*), it appeared that the predecessor of the defendant company had constructed a bridge over a cut, the bed of which had been graded, but on which no rails had been laid. This bridge had been suffered to decay, and the question was whether the defendant company, as the successor of the original company, was under an obligation to rebuild it. The question was, apparently, one of legal duty, not of conflicting easements. It was, in view of such a situation, that Mr. Justice Reed said: "The doctrine that a court of equity will not act in any instance where the common-law courts possess adequate power to afford the relief asked for, is fundamental. The power of the common-law courts to compel the performance of duties of the kind under consideration * * * is complete."

Be this as it may, I must hold that, from whatever source derived, the power to compel railroad elevation over a highway, if that is the only way in which the joint user can be properly secured and enjoyed, exists in this court. Chancellor Magie was, as it seems to me, strictly logical when he held that inasmuch as it had been decided that the second clause of section 29 was broad enough to confer the power to order the company to reconstruct its railroad bridge over a highway by lengthening it and removing part of the railroad embankment, it was also broad enough to authorize this court to order the defendant company to reconstruct its tracks across the highway by elevating or depressing them. If the generality of the language of the clause included the one, it necessarily included the other.

But an affirmation of the jurisdiction of this court does not solve the question as now presented. The allegations of the bill are so general that they present little more than the abstract question whether, under *any* circumstances, this court would compel a railroad company to elevate or depress its tracks. The decision was that in a proper case it would. Whether it would or not was held to depend upon the special facts. To these I now address myself.

Summer avenue is a residence street. The houses fronting

upon it extend northward as far as the railroad. Further north there are still many vacant lots, both on the avenue itself and to the east and west of it, but the town is growing in that direction. There are six tracks laid across the avenue at grade. The general lay of the land in the immediate vicinity is level, and the tracks, if unobstructed by cars, moving or standing still, may be seen eastward and westward by a person standing from twenty to thirty feet away, for about a quarter of a mile. From one thousand to one thousand two hundred people and over one hundred vehicles cross daily between six o'clock A. M. and six o'clock P. M., and about a third as many at night. From twenty-two to twenty-eight passenger trains. each way pass over the crossing every twenty-four hours. The number of freight trains running through is small, but in the operations of the local yard, and in the making or breaking up of trains, freight cars frequently cross and recross the avenue. The yard and freight station are between Summer avenue and Washington avenue. The obstruction to travel seems to be mainly due to the freight cars. The gates are frequently lowered and the delay amounts, at times, to several minutes. According to complainant's count, in the twenty-four hours between 6 A. M. of August 2d and August 3d, 1907, the gates were down thirty times for three minutes or more. The report shows that the delay to travel thus occasioned resulted chiefly from the handling of freight cars. As the freight-house and water tank, as well as the yard, are in the vicinity, the side tracks are seldom unoccupied and the cars standing on them are a serious obstruction to the view up and down the tracks. The street crosses the railroad at right angles. It occupies the site of an old highway that was laid out many years before the advent of the railway.

This, I think, gives a general view of the situation. The question is whether such a situation calls for an elevation of the road at the point in question under the rule laid down in the *Central Railroad Case*. It is admitted that it cannot be depressed, and, if elevated, the grade at Mount Prospect avenue, further to the westward, will have to be changed.

The first thing that strikes one is that it has not yet become the policy of the state, as evinced by its legislation, to require

crossings, generally, to be otherwise than at grade, although there has been some advance in that direction.

In the beginning of railroad construction the practice of laying the tracks at the grade of the highways, unless unadvisable from an engineering standpoint, was universal. The cities were then small, the trains slow and infrequent and the tracks few. As the cities grew and the trains and tracks became more numerous, the state began to take precautions for the public safety. In 1839 it was enacted that a bell should be placed on the engine and rung at least three hundred yards from the highway. It was also provided that a board with the inscription "Look out for the Locomotive" should be erected and maintained. By the act of 1852 the company was allowed to blow a steam whistle as a substitute for a bell. These have been the only precautions that were generally deemed indispensable by the legislature where trains crossed highways at grade. But the courts went further. They held that under circumstances of special danger— for example, where there was a railroad curve within a short distance of the highway, or where the company itself had erected buildings close to the tracks so as to obstruct the view, a duty to take special precautions arose, and the company must provide gates or a flagman. *Pennsylvania Railroad Co.* v. *Matthews, 36 N. J. Law (7 Vr.) 531.* But in a long series of cases the courts have decided that if the element of *special* danger be wanting, then neither the court nor the jury can require more than the legislature has seen fit to prescribe, viz., the ringing of a bell or the blowing of a whistle and the erection of sign posts. *New York Railroad Co.* v. *Leaman, 54 N. J. Law (25 Vr.) 202.* This is the law to-day.

What the legislature has done toward further protecting the highways is this: It has authorized cities and other municipalities to require, by ordinance, flagmen, or gates to be placed at designated crossings. *Delaware, Lackawanna and Western Railroad Co.* v. *East Orange, 41 N. J. Law (12 Vr.) 127; Morris and Essex Railroad Co.* v. *Orange, 63 N. J. Law (34 Vr.) 252.* This, of course, is a legislative recognition that railroads may cross streets at grade.

It has authorized the governing body of any township or mu-

nicipality to petition this court to order gates to be erected, or a flagman stationed at any grade crossing, or that some other reasonable provision be made for protecting the crossing. *P. L. 1903 p. 664 § 36; Palmyra* v. *Pennsylvania Railroad Co., 62 N. J. Eq. (17 Dick.) 601; Eckert* v. *Perth Amboy and Woodbridge Railroad Co., 65 N. J. Eq. (20 Dick.) 777.* This is also a legislative recognition that railroads may cross at grade.

And it has also declared (section 27 of the same act) that any railroad thereafter to be constructed (*Newark* v. *Central Railroad Co., 67 All. Rep. 1009*) shall cross streets either above or below grade unless the governing body thereof shall permit crossing at grade. This is a further recognition of the lawfulness of grade crossings in cities, if the cities agree thereto.

With a view to the gradual abolition of grade crossings by mutual consent, it has provided that any municipality or township, or in the case of a county road, the board of chosen freeholders, may enter into contracts with railroad companies to abolish grade crossings. *P. L. 1874 p. 47; P. L. 1901 p. 116; P. L. 1902 p. 402; P. L. 1903 p. 659 ¶¶ 30, 31.*

The legislature has gone a step further; it has enacted that on the initiative either of a city of the first class or of a railroad company, application may be made to the supreme court for an order compelling the abolition of grade crossings. If that court finds that the change is feasible and that it may be made without unreasonable cost, the matter is referred to commissioners to prepare a plan, and if the plan be approved the court apportions the cost of the work. This act, it will be seen, differs from the acts of 1901 and 1903 in that its provisions may be put into operation by either party without the consent of the other. *P. L. 1896 p. 139.*

In view of this legislation it is quite impossible to hold that grade crossings are, *per se,* illegal structures, even in cities, or that streets are not *safe* in the legislative sense of that word, merely because they are crossed at grade by railroad tracks. There must be something in the situation so peculiar as to compel the court to say that gates will not adequately protect the public; that flagmen will not; that nothing but track elevation will.

And it cannot be maintained that the streets become unsafe and inconvenient when more than one track is laid across them. In *Allen* v. *Jersey City, 53 N. J. Law (24 Vr.) 522,* it was held by the supreme court that the Erie railroad could, against the consent and protest of Jersey City, lay another track across Jersey street, one of its main thoroughfares.

The question, then, must be, as I have said, whether gates and flagmen and other expedients are, in the given case, so inefficacious that nothing but track elevation will give to the public, in fact as well as in name, the joint use of the highway. It is obvious that a street may be so encumbered with tracks that the public is practically shut out from using it. As neither party is at liberty to destroy the right of the other, the appropriate remedy in such a case would appear to be an injunction restraining the excessive use. *Newark* v. *Central Railroad Co., 73 N. J. Eq. (3 Buch.) 469; Newark* v. *Delaware, Lackawanna and Western Railroad Co., 42 N. J. Eq. (15 Stew.) 196.* If, on the other hand, the number of tracks be not excessive, it is still conceivable that the trains might run over them with such frequency and speed and at such an angle or with such curves that the joint user of the crossing would be practically gone. The question is, then, one of fact, to be determined according to the circumstances of the case.

In considering the question, it must, however, be remembered that it is no light thing to order a change in the grade of a steam railway. In the language of Chief-Justice Church in *People* v. *New York Central and Hudson River Railroad Co., 74 N. Y. 302,* "the grade necessarily embraces considerations of convenience, expense and facility of construction and operation and is fixed at a particular point with reference to grades at other points." The legislature has, therefore, necessarily vested the company with a considerable discretion in determining what and where it shall be.

Coming to the evidence, it appears that there has, as yet, been no accident, although the situation, as it exists, seems to be such that one might easily occur, especially as the crossing is used daily by a considerable number of school children on their way to and from the public school. The only safeguard hitherto

provided has been gates, raised and lowered by an operator in a tower, several hundred feet distant.

But there is a complication in the case. The company has, without the consent of the city, placed on the crossing no less than six tracks. One of these is conceded to be merely for the convenience of a nearby factory (as to which, see *Montgomery v. Trenton, 36 N. J. Law (7 Vr.) 279*) ; another for the convenience of another factory, but occasionally used for general freight delivery. Still another—the north siding—is used in connection with the defendant's yard, of which it seems to be an adjunct. Mr. English, in his evidence, calls it a passing siding. He admits, however, that it has a dead end and that it is used most of the day for the storage of coal and other cars. These three tracks, so far as they are laid upon the highway, seem to me to be unlawful structures. The right of the railroad over the highway is a right of passage with the reasonable incidents of passage—nothing more. In the case of *Pennsylvania Railroad Co. v. Angel, 41 N. J. Eq. (14 Stew.) 328*, Justice Dixon portrayed a situation similar to that I am now dealing with. He said: "In our judgment, they (the legislative provisions) indicate that those rights are such as pertain to the use of the avenue for the purposes of a way; not the purposes of a station yard. The primary privilege given is that of passage. This and its reasonable incidents cover the whole scope of the grant. The right of storing engines and cars, either for a longer or a shorter period, the right of making up or breaking up trains, are not embraced in such a concession. These are strictly terminal and station purposes, and by providing for station yards, the legislature has indicated its intention that business of that nature should be transacted there. * * * Having a right of passage, it (*i. e.,* the Pennsylvania Railroad Company) used its tracks as though they were within its terminal yards, and so used them constantly in its every day concerns." Accordingly, an injunction was given against the use of the tracks for purposes other than of passage.

The case of *State v. Morris and Essex Railroad Co., 25 N. J. Law (1 Dutch.) 437*, is very much in point. There the railroad had been indicted for obstructing the highway at or near the

village of Rockaway by placing its cars upon the streets and allowing them to remain there and obstruct its use. Chief-Justice Green said: "It is admitted that the freight could not be received and discharged at the Rockaway depot in its present location without, to some extent, impeding the public travel, and that the defendants have not willfully caused any obstruction beyond what their business at this depot required. The necessity of obstructing the highway results, *not from the exercise of their corporate rights, but from the improper location of their depot.* A station house and freight depot may be necessary to the operations of the company. It may be necessary that the cars should stand for half an hour, or an hour, to receive and discharge freight. But there is no necessity that the depot should be so located as to cause an obstruction of the highway by the cars. The company cannot, by its own imprudence, create a necessity for the obstruction, and then justify the nuisance on the ground of the necessity which they have created. Because a depot is necessary to the operations of the company, they are not, therefore, justified in building it upon the highway or so near it that their trains must injuriously affect public travel. The fallacy of the argument on the part of the defendants consists in assuming that placing the depot in its present location was a matter of necessity."

In these two decisions is indicated the solution of the present question. The company, in the case in hand, has been doing just what the court of errors and appeals and the supreme court said, in the cases above quoted from, it could not do. For its own convenience it has placed its switches, its .sidings, its yards, its freight depot and its water tank in such close proximity to the highway that it now finds it necessary to use it otherwise than as a way.

Of the three remaining tracks, two are undoubtedly used for passage. The third, as I gather from the evidence, is used both for passage and for yard or station purposes. It cannot be lawfully used for the latter where it crosses the avenue.

If the three tracks first spoken of, where they cross the highway, be eliminated and the unlawful use of the other enjoined, I do not think that the crossing, properly guarded, will be more

dangerous in an absolute sense than most of the other grade crossings in the cities and many of the other municipalities of the state.

To sum up: The legislature has not seen fit to abolish grade crossings except to the extent heretofore indicated. It still authorizes them with the proviso, however, that where, in the future, any railroad shall cross any street in any city, it shall cross above or below grade, unless the governing body of the city grant permission to cross at grade. In this state of the legislation upon the subject, I think the court can go no further, in a case situated as this is, than to enjoin the use in the highway of the three tracks above referred to, and the unlawful use of the fourth. On the evidence it would seem that a flagman should be stationed at the crossing, but I doubt whether an order to that effect could be made in this proceeding. It would hardly come within the scope of the bill.

The two cases relied upon by counsel for the city (*State* v. *St. Paul, &c., Railroad Co., 108 N. W. Rep. 261,* and *State* v. *Duluth* (same volume), are not in point. There the necessity of a bridge which had, in fact, existed over the *locus in quo* for some time, was conceded. The question was, who should bear the expense of maintaining it. Here, the necessity of the overhead crossing is the very point in controversy.

The question whether the tracks that have been found to have been illegally laid over the street should be actually taken up, has not been argued. I presume that if they cannot be used for any purpose they would naturally be removed. They would seem to be illegal obstructions and, if allowed to remain, would be calculated to distract the attention of persons about to cross, who would not know on which of them to look for approaching trains. If, however, counsel desire to be heard on this subject, I will hear them.

The bill, although primarily designed to enforce track elevation, is broad enough in its statements to warrant the giving of the relief indicated. There is a prayer not only for depression or elevation of the tracks, but also for general relief.